

SHAWN LEWIS,
　Plaintiff,

v.

MEYER & BURNETT, PLLC;
PHILIP MEYER II, individually;
PRAIRIE PASS HOMEOWNERS
　ASSOCIATION, INC.;
PRAIRIE PASS DEVELOPMENT, LLC;
D.R. HORTON, INC.;

SELBY-WEBB PROPERTY
　MANAGEMENT, INC.,
　Defendants.

Civil Action No. _1:26-cv- 84_

JURY DEMAND *Judges Collier / Dumitru*

## VERIFIED COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF

Plaintiff Shawn Lewis ("Plaintiff"), proceeding pro se, brings this Verified Complaint against the above-named Defendants and states as follows:

## JURISDICTION AND VENUE

1. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692–1692p.

2. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a). In the event this Court declines supplemental jurisdiction under § 1367(c), Plaintiff reserves the right to refile all state law claims in the Chancery Court or Circuit Court of Hamilton County, Tennessee.

3. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events occurred in Hamilton County, Tennessee, and all Defendants reside or conduct business in this district.

## PARTIES

4. Plaintiff Shawn Lewis is a natural person and citizen of Tennessee residing at 3330 Grassy Fields Lane, Apison, Tennessee 37302. Plaintiff is a "consumer" under 15 U.S.C. § 1692a(3).

5. Defendant Meyer & Burnett, PLLC ("Meyer & Burnett") is a Tennessee PLLC at 2 W. Aquarium Way, Unit 300, Chattanooga, Tennessee 37402. Meyer & Burnett is a "debt collector" under 15 U.S.C. § 1692a(6) because it regularly collects or attempts to collect debts owed to others. Meyer & Burnett's own March 17, 2026 letter includes the FDCPA mini-Miranda disclosure ("Take notice that we are attempting to collect a debt"), which constitutes a functional admission that the firm was acting as a debt collector. See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 559 U.S. 573 (2010).

6. Defendant Philip Meyer II ("Meyer") is a natural person, an attorney licensed in Tennessee, and a principal of Meyer & Burnett. Meyer personally signed both the March 17 and March 23, 2026 collection letters. He is individually a "debt collector" under 15

U.S.C. § 1692a(6). See Kistner v. Law Offices of Michael P. Margelefsky, LLC, 518 F.3d 433, 437 (6th Cir. 2008).

7. Defendant Prairie Pass Homeowners Association, Inc. ("Prairie Pass" or the "Association") is a Tennessee nonprofit corporation administering the Prairie Pass Planned Unit Development. Prairie Pass is sued under the Tennessee Consumer Protection Act and for breach of the Declaration of Covenants and Restrictions.

8. Defendant Selby-Webb Property Management, Inc. ("Selby-Webb") is a Tennessee corporation at 600 Georgia Avenue, Suite 4, Chattanooga, Tennessee 37402. Selby-Webb serves as property manager for Prairie Pass and was directly responsible for the billing failures, contact-information misrepresentations, refusal to provide documentation, and failure to process Plaintiff's payment at issue herein.

8A. Upon information and belief, Braden Selby is a principal of Selby-Webb Property Management, Inc. and simultaneously serves as the Registered Agent of Prairie Pass Homeowners Association, Inc. (per the Tennessee Secretary of State's records). This dual role — principal of the property management company and registered agent of the HOA — further undermines any claim that Selby-Webb is an independent, arm's-length third-party manager. It also raises questions about whether Selby-Webb's interests are aligned with the Association's Members or with its own financial interest in generating collection fees and management revenue from the Association it helps administer.

9. Defendant Prairie Pass Development, LLC ("Developer") is a Tennessee limited liability company that acquired all rights, duties, and functions of the original developer (WPBS Investments, G.P.) by assignment recorded in Book 10974, Page 724, Register's Office of Hamilton County, Tennessee. Under the Declaration and Bylaws, the Developer retains

all governing authority for the Association until it "in its sole discretion determines to call a special meeting of the Association to elect a Board to succeed Developer" (Bylaws § 5.12). As of the Third Amendment (October 2021, Book 12718, Page 104), the Developer had not transferred governing authority. Upon information and belief, the Developer has never transferred governing authority, has never called a special meeting to elect a Board, and has exercised all powers and functions of the Board of Directors for over fourteen (14) years since the Association's formation in 2012. Steven Kip Taylor signed the Third Amendment as Manager of Prairie Pass Development, LLC and as Managing Partner of Trust Homes, LLC.

9A. Defendant D.R. Horton, Inc. ("D.R. Horton") is a Delaware corporation doing business in Tennessee. D.R. Horton is the developer, declarant, and builder of the Prairie Pass subdivision and is the entity that established, controls, and/or operates the Prairie Pass Homeowners Association. D.R. Horton is sued as the parent entity and ultimate controlling authority over the Prairie Pass development. D.R. Horton cannot insulate itself from liability by operating through an HOA and related entities it created, controls, and staffs while those entities violate the statutory rights of their own members. The violations documented herein are directly attributable to D.R. Horton as the party with ultimate authority over the HOA's operations, policies, and legal compliance.

9B. Upon information and belief, D.R. Horton, Inc. is not merely a passive investor or distant corporate parent. D.R. Horton actively exercises dominion and control over Prairie Pass Homeowners Association and its governance. In or about July 2025, D.R. Horton, acting in its capacity as the builder and developer, held a private meeting with hand-selected residents of Prairie Pass to discuss community concerns. This meeting was conducted

secretly, without notification to the homeowners at large, without any selection criteria being disclosed, and without any minutes or summaries being shared with the community afterward. D.R. Horton attended and conducted this meeting in its capacity as the HOA — not merely as the builder — thereby exercising the governance functions of the Board of Directors under Bylaws § 5.12.

9C. On July 29, 2025, Plaintiff sent a formal written demand to the Board of Directors of Prairie Pass Homeowner's Association, Inc., posted publicly in the Prairie Pass community Facebook group administered by Selby-Webb, demanding answers regarding: (1) the selection criteria for the hand-picked representatives; (2) why all homeowners were not given the opportunity to participate; and (3) when meeting notes or summaries would be provided to all members. This demand was ignored. No response was ever received from the Board, the Developer, D.R. Horton, or Selby-Webb. This is the same pattern of stonewalling that Defendants would later repeat in 2026 with respect to Plaintiff's billing dispute, records inspection demand, and FDCPA dispute.

9D. D.R. Horton's direct participation in HOA governance functions — including holding meetings with residents, selecting "representatives," and discussing community concerns — establishes that D.R. Horton exercises such dominion and control over Prairie Pass Development, LLC and Prairie Pass Homeowners Association, Inc. that the latter entities have no separate mind, will, or existence of their own with respect to HOA governance. D.R. Horton is the functional alter ego of the Developer and the Association for purposes of the claims alleged herein. D.R. Horton cannot insulate itself from liability by operating through entities it created and controls while those entities violate the statutory rights of homeowners.

9E. On July 16, 2025, Selby-Webb, acting as the official administrator of the Prairie Pass HOA Facebook page, publicly posted a new fine schedule on behalf of the Association. When a resident asked in the comments, "Who are the board of directors?," the Prairie Pass HOA account (operated by Selby-Webb) responded: "Currently, the Prairie Pass HOA is under developer control, with D.R. Horton serving as the declarant and appointing the board of directors." This is a public, written admission by the Association's own property manager that D.R. Horton — not merely Prairie Pass Development, LLC — is the entity currently serving as declarant and exercising the power to appoint the Board of Directors under the Declaration and Bylaws. D.R. Horton's status as the active declarant who appoints the Board is not an allegation upon information and belief; it is an admission by the Association's own agent.

9F. In the same Facebook thread, a resident requested: "Would you please send a copy of the new CC&Rs to residents please?" The Prairie Pass HOA account responded: "We will definitely do that once they are recorded and released by DR Horton." This response confirms that D.R. Horton controls even the recording and release of the Association's governing documents. No such documents were ever sent to residents, including Plaintiff. D.R. Horton's control over the Association's governing documents, its power to appoint the Board of Directors, and its direct participation in HOA governance meetings (as alleged in ¶9B) establish that D.R. Horton is the controlling entity behind Prairie Pass Homeowners Association in fact, not merely in corporate structure. In a separate PDF newsletter distributed in July 2025, the Association further represented that the fee schedule "will be mailed to owners, with copies also emailed and posted on our new Facebook page." Despite these multiple written promises of distribution, Plaintiff was

never mailed, emailed, or otherwise furnished the fee schedule or the CC&R amendments.

9G. In a PDF newsletter distributed to Prairie Pass homeowners and posted on the Prairie Pass HOA Facebook page in July 2025, the Association stated: "DR Horton has finalized amendments to the Covenants, Conditions, and Restrictions. Their legal department is recording the documents with the county, and we'll distribute copies to owners once approved." This admission establishes that: (a) D.R. Horton's in-house legal department — not Prairie Pass Development, LLC, not the Association, and not outside counsel — is responsible for drafting, finalizing, and recording the Association's governing documents; (b) D.R. Horton exercises approval authority over the CC&Rs before they may be distributed to homeowners; and (c) D.R. Horton controls the legal infrastructure of the Association at the most fundamental level. An entity whose own legal department drafts the rules, records the rules, and approves the rules governing a homeowners association is not a passive investor or a mere corporate parent — it is the Association's alter ego in every material respect.

9H. The same newsletter stated: "The fee schedule for CC&R violations is complete and will be mailed to owners, with copies also emailed and posted on our new Facebook page." Plaintiff was never mailed the fee schedule. Plaintiff was never emailed the fee schedule. The promised distribution of the CC&R amendments described in this newsletter — to be provided "once approved" by D.R. Horton — was never completed. The Association and its agents have now made at least three separate representations that governing documents and fee schedules would be distributed to homeowners, and have failed to follow through on each occasion. This pattern of promising transparency and delivering

secrecy is directly relevant to the good-faith inquiry required for attorney's fees under T.C.A. § 48-66-104 and the willfulness inquiry under T.C.A. § 47-18-109(a)(3).

9I. Upon information and belief, D.R. Horton's legal department's control over the Association's governing documents raises the further question of whether D.R. Horton's legal department authorized the retention of Meyer & Burnett, PLLC to pursue collection against Plaintiff. If D.R. Horton's legal department controls the Association's legal affairs — as the newsletter and Facebook admissions establish — then D.R. Horton is directly responsible for the retention of the debt collector whose FDCPA violations are set forth in Counts I through III and XIX of this Complaint. Discovery will reveal the full extent of D.R. Horton's involvement in the decision to retain Meyer & Burnett and the specific collection instructions given.

### ARTICLE III STANDING

10. Plaintiff has suffered concrete, particularized, actual injuries including:

(a) Monetary Harm: No less than $400.00 in unauthorized "Intent to Lien / Legal Charge" fees (including, but not limited to, $175.00 assessed November 21, 2024 and $225.00 assessed February 18, 2026), plus any additional fees, charges, interest, penalties, or costs that have been or may hereafter be assessed to Plaintiff's account in excess of the base semi-annual assessments authorized by Article V of the Declaration. The exact total of unauthorized charges is unknown to Plaintiff at this time because Defendants have refused to provide a full, itemized accounting. See TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2204 (2021) ("Physical or monetary harms readily qualify as concrete injuries.").

(b) Property Harm / Cloud on Title: Defendants threatened to record a lien against Plaintiff's real property, constituting a cloud on title analogous to common-law slander of title. This impairs Plaintiff's ability to sell, refinance, or deal with the property.

(c) Informational Injury Analogous to Fraud: The March 17, 2026 letter demanded payment within four (4) days while disclosing a 30-day dispute right, creating a facially misleading communication analogous to common-law misrepresentation.

(d) Diversion of Resources: Plaintiff, a pro se litigant managing multiple active lawsuits, was required to divert substantial time and resources from other pending matters to respond to Defendants' unlawful collection communications.

(e) Impairment of Alienability / Sale Damages: Plaintiff intends to sell the property at 3330 Grassy Fields Lane. The disputed charges, threatened lien, and this litigation — all caused by Defendants' unlawful conduct — create a cloud on title that will appear in any title search and will materially impair Plaintiff's ability to sell the property at fair market value, or at all. Under Tennessee law, impairment of alienability is a recognized concrete harm. See Wagner v. Fleming, 139 S.W.3d 295, 301 (Tenn. Ct. App. 2004) (recognizing slander of title claims for interference with property rights). The costs of clearing title, the delay in sale, the potential loss of buyers, and any diminution in sale price attributable to the cloud on title are actual damages that Plaintiff will prove at trial. These damages are directly and proximately caused by Defendants' assessment of unauthorized fees, their threat to record a lien for those unauthorized fees, and their refusal to validate or withdraw the disputed charges after receiving Plaintiff's timely written dispute.

9

## FACTUAL ALLEGATIONS

### A. The Property and HOA Membership

11.  Plaintiff owns 3330 Grassy Fields Lane, Apison, Tennessee 37302, a lot within the Prairie Pass Planned Unit Development, governed by the Declaration recorded in Book 9594, Page 690, Register's Office, Hamilton County, Tennessee, as amended by the First Amendment (Book 9630, Page 864), Second Amendment (Book 10974, Page 728), and Third Amendment (Book 12718, Page 104).

12.  Plaintiff is a Member of the Association and acknowledges an obligation to pay annual assessments under Article V of the Declaration. Plaintiff has at all times been ready, willing, and able to pay the undisputed base assessments of $750.00. Upon the filing of this Complaint, Plaintiff is prepared to deposit $750.00 into the registry of this Court.

### B. The Association's Billing Failures and Misrepresentations

13.  For approximately twelve (12) months, Plaintiff received no invoice, statement, or billing of any kind from the Association or Selby-Webb.

14.  When Plaintiff proactively contacted Selby-Webb, Sharon Goins stated the Association had "all improper contact information." This was false. Plaintiff's correct name, address, and email were in the closing documents and never changed.

15.  On November 26, 2025, Goins admitted in a written email that the phone numbers Selby-Webb had on file for Plaintiff were 407-695-8623 and 321-231-0511 — both of which are Florida area codes. Plaintiff has never owned either number. Plaintiff's actual phone number is a 407 area code number (407-274-4940), which Plaintiff had previously

provided. Selby-Webb was calling strangers in Florida while claiming to have attempted to reach Plaintiff.

16. Neither the Association nor Selby-Webb ever sent billing correspondence to the property address itself (3330 Grassy Fields Lane), which under Declaration § 9.04 is a sufficient notice address.

### C. Plaintiff's Repeated Attempts to Resolve the Account

17. Beginning on or about November 26, 2025, Plaintiff engaged in a series of emails with Selby-Webb, proactively seeking to resolve the account. Plaintiff responded to every communication immediately and in good faith.

18. On January 13, 2026, Sharon Goins sent Plaintiff an email threatening collection action and stating that "an additional lien fee of $225.00 will be assessed if the matter proceeds to that stage."

19. Between January 13 and January 16, 2026, Plaintiff made four (4) separate attempts to contact Selby-Webb, including emails on January 14, January 15 (twice), and January 16, 2026. Plaintiff's January 15 email stated: "This is my 3rd attempt at reaching someone with no response."

20. On January 16, 2026, Plaintiff offered to begin paying $100 per month ("$1,200 over the year") while the disputed charges were resolved, and requested documentation supporting the $175.00 charge. Selby-Webb's Marlene Webb rejected the payment arrangement, stating "$100 per month is not acceptable."

21. When Plaintiff specifically asked to speak with the attorney referenced on his account and requested documentation for the disputed charges, Marlene Webb responded: "You

can speak to him once we turn you over." This statement constitutes an express, willful refusal to provide Plaintiff with any information about the charges assessed against his account — conditioning Plaintiff's access to information on the escalation of collection proceedings against him.

22. Marlene Webb further admitted she could not explain the charges on Plaintiff's own account, stating: "I don't know anything about a $250 charge being tacked on to your account yet. This only happens when the attorney bills us." This admission demonstrates that even the property manager could not verify or explain the charges being imposed on Plaintiff.

**D. Plaintiff's $750.00 Payment**

23. In late November/early December 2025, Plaintiff mailed a check for $750.00 to Selby-Webb representing one year of association dues.

24. Upon information and belief, that check was received but never processed. Alternatively, if lost in transit, the Association's own 12-month failure to bill and to maintain correct contact information was the proximate cause.

25. On February 18, 2026, Selby-Webb acknowledged by email it could not locate the payment through the Zego application. Rather than working with Plaintiff, the Association retained counsel to threaten lien enforcement.

26. On the same date, Plaintiff responded: "Consider this amount disputed as payment was sent."

**E. Unauthorized "Intent to Lien" Charges**

27. On November 21, 2024, at 12:00:47 PM (per Selby-Webb's own system timestamp, provided in Sharon Goins's November 26, 2025 email), a $175.00 "Intent to Lien — Legal Charge" was assessed to Plaintiff's account.

28. On February 18, 2026, a $225.00 "Intent to Lien — Legal Charge" was assessed, after being specifically threatened in Goins's January 13, 2026 email.

29. No provision of the Declaration authorizes flat-dollar "Intent to Lien" charges. These charges are unauthorized under every possible characterization:

30. To the extent the $175.00 and $225.00 charges are "special assessments" under Declaration § 5.04 — being charges "in addition to the annual assessments" imposed on a specific Lot rather than all Members equally — they required the assent of seventy-five percent (75%) of the Members at a duly called meeting with thirty (30) days' written notice. No such meeting was held and no such vote occurred. The charges are void.

31. To the extent the charges are "costs and expenses and reasonable attorneys fees which may be incurred by the Association in enforcing the lien" under Declaration § 5.08 — the $175.00 charge was assessed in November 2024, over four months BEFORE Meyer & Burnett was retained in March 2026, and therefore cannot constitute attorney's fees actually incurred. Selby-Webb's own representative (Marlene Webb) admitted on January 16, 2026 that she did not know what the $175.00 charge was for. No itemization of actual costs or fees incurred has been provided. The charges are unauthorized.

32. To the extent the charges are "fines" imposed under the sanctions procedure in Declaration § 7.02 — the Association was required to serve written notice describing (a) the alleged violation, (b) the proposed sanction, (c) a ten (10) day period to request a

hearing, and (d) a statement that the sanction would be imposed if not challenged. None of this process was followed. The charges are void.

33. Under all three characterizations, the $175.00 and $225.00 fees are unauthorized, and no board resolution, fee schedule, or other authorization for these charges has been produced despite repeated demands.

33A. On July 16, 2025, Selby-Webb posted on the Prairie Pass HOA Facebook page that "The Prairie Pass Homeowners' Association Board of Directors has adopted a new fine schedule" effective July 10, 2025. This fine schedule provides for: (1) an initial notice with 15 days to correct; (2) a second notice with another 15 days; (3) after 30 days, a $50 initial fine followed by a $25 daily fine; and (4) if fines exceed $1,000, a lien may be placed. This fine schedule does not authorize flat-dollar "Intent to Lien / Legal Charge" fees of $175.00 or $225.00 — the amounts assessed against Plaintiff's account. Moreover, the $175.00 charge was assessed on November 21, 2024 — nearly eight months before this fine schedule was even adopted. The unauthorized charges are therefore unauthorized under both the pre-July 2025 regime (in which no fine schedule existed at all) and the post-July 2025 regime (which does not authorize the specific charges assessed).

33B. Bylaws § 5.16 requires that copies of all Rules and Regulations be furnished to each Owner prior to the time they become effective. Plaintiff was never furnished a copy of this fine schedule. When a resident publicly requested that the new CC&Rs be sent to residents, the Prairie Pass HOA account responded that they would be sent "once they are recorded and released by DR Horton." No such documents were ever sent. This fine schedule was adopted without notice to Members and without compliance with the

Bylaws' requirement that copies be furnished prior to effectiveness, rendering it void as to any homeowner who did not receive it.

33C. Significantly, this fine schedule was not included in the documents provided to Plaintiff by Meyer & Burnett in connection with the March 2026 collection demand. Meyer & Burnett refused Plaintiff's requests for documentation, claiming "privilege" and characterizing them as "excessive." The failure to produce the fine schedule — which, if produced, would have revealed that it does not authorize the charges assessed against Plaintiff — constitutes further evidence of the deliberate concealment of the unauthorized nature of these fees.

34. Under 15 U.S.C. § 1692f(1), a debt collector may not collect any amount "unless such amount is expressly authorized by the agreement creating the debt or permitted by law." The foregoing charges are not authorized by the Declaration, and Plaintiff reserves the right to challenge any additional fees, costs, interest, penalties, attorney's fees, or other amounts that have been or may hereafter be assessed against his account in excess of the base semi-annual assessments.

### F. Meyer & Burnett's Collection Letters

35. On March 17, 2026, Meyer & Burnett sent a demand letter demanding $1,400.00 and threatening to record a lien if payment was not made "on or before March 21, 2026" — four (4) calendar days (96 hours) from the letter's date. The same letter disclosed Plaintiff's 30-day right to dispute under § 1692g(a).

36. Under the "least sophisticated debtor" standard applied in the Sixth Circuit, see Harvey v. Great Seneca Fin. Corp., 453 F.3d 324, 329 (6th Cir. 2006), the juxtaposition of a 4-day

payment deadline with a 30-day dispute right would cause the least sophisticated debtor to reasonably forego the dispute right. See also Mashiri v. Epsten Grinnell & Howell, 845 F.3d 984, 991 (9th Cir. 2017) (holding virtually identical HOA pre-lien letter violated FDCPA). No federal circuit has rejected Mashiri's reasoning. See also Swanson v. Southern Oregon Credit Serv., 869 F.2d 1222, 1225 (9th Cir. 1988) (the objective effect on the reader controls, not the debt collector's subjective intent).

37. The letter further threatened "further legal action, including filing a notice of lien" without disclosing that collection must cease upon written dispute — an independent overshadowing violation. See Mashiri, 845 F.3d at 992.

38. On March 17, 2026, Plaintiff sent a formal written dispute under § 1692g(b), disputing the entire amount and demanding verification.

39. On March 23, 2026, Meyer & Burnett responded by: (a) failing to provide verification; (b) demanding Plaintiff "tender the amount owed"; (c) stating additional charges "will not be waived or removed"; and (d) refusing document requests by claiming "privilege." This constitutes continued collection after written dispute without verification, violating § 1692g(b). See Jang v. A.M. Miller & Assocs., 122 F.3d 480, 483 (7th Cir. 1997); Clark v. Capital Credit & Collection Servs., Inc., 460 F.3d 1162, 1174 (9th Cir. 2006); Foti v. NCO Financial Systems, 424 F. Supp. 2d 643, 667 (S.D.N.Y. 2006) (demand for payment after written dispute constitutes continued collection activity regardless of characterization).

**G. Meyer's Prior Relationship with the Developer**

40. The Third Amendment (Book 12718, Page 104, November 2021) was prepared by "Hurst & Meyer PLLC, Attn: Philip M. Meyer II." The Second and Third Amendments both recite that the Developer "has not transferred the governing authority." Upon information and belief, governing authority transfer remains unresolved, raising questions about who authorized Meyer & Burnett's retention and these specific fee amounts.

**H. Complete Failure of HOA Governance and Developer Anonymity**

41. The Developer (Prairie Pass Development, LLC) has retained sole governing authority over the Association for over fourteen (14) years since its formation in 2012. The Second Amendment (February 2017) and Third Amendment (October 2021) both recite that the Developer "has not transferred the governing authority for the Development to the Board of Directors of Prairie Pass Homeowner's Association in accordance with the By-laws." Bylaws § 5.12 provides that the Developer exercises "all the powers and privileges and performing all the duties and obligations" of the Board "until such time as the Developer in its sole discretion determines to call a special meeting." Upon information and belief, no such special meeting has ever been called.

42. During this fourteen-year period, control of the Developer entity has passed through multiple hands without any homeowner ever being informed. The original developer was WPBS Investments, G.P. (Haresh Patel, General Partner), which signed the Declaration in 2012. Developer rights were subsequently assigned to Prairie Pass Development, LLC by assignment recorded in Book 10974, Page 724. Gabriel Thomas signed the Second Amendment in February 2017 as President of Prairie Pass Development, LLC. By October 2021, Steven Kip Taylor signed the Third Amendment as Manager of Prairie

Pass Development, LLC and simultaneously as Managing Partner of Trust Homes, LLC. No homeowner was notified of any of these changes in the identity of the entity and individuals exercising Board authority over the Association.

42A.  The lack of transparency regarding Board identity and authority is further confirmed by the public record. On July 16, 2025, when a resident asked on the Prairie Pass HOA Facebook page "Who are the board of directors?," the Association's own property manager (Selby-Webb) responded that the HOA is "under developer control, with D.R. Horton serving as the declarant and appointing the board of directors." The fact that a homeowner had to ask this basic question on a public social media platform — and that the answer identified an entity (D.R. Horton) that does not appear in any of the recorded Declaration amendments — demonstrates the complete breakdown of corporate governance and transparency that has characterized this Association throughout its existence.

43.  Under Bylaws § 5.12, whoever holds the Developer rights exercises ALL powers of the Board — including the power to set assessments, impose fees, retain property managers, retain attorneys, and authorize liens against homeowners' real property. These are extraordinary powers over Members' homes and finances. Yet no Member of Prairie Pass has ever been told: (a) who is currently exercising these powers; (b) when Developer rights changed hands; (c) what entity currently holds Developer rights; (d) who the individual decision-makers are; (e) how to contact the entity or individuals exercising Board authority; or (f) whether further assignments of Developer rights have occurred since 2021. T.C.A. § 48-66-101(e)(6) requires the Association to maintain at its principal office "a list of the names and business or home addresses of its current directors and

officers." Under § 5.12, the Developer IS the functional director and officer. This information has never been maintained or disclosed.

44. Bylaws § 6.02 requires an annual meeting of the Association on the first Monday of February each year. T.C.A. § 48-57-101 independently requires all Tennessee nonprofit corporations to hold annual meetings of members — a statutory obligation that applies regardless of who is exercising Board functions and cannot be waived by the Declaration or Bylaws. Upon information and belief, no annual meeting has been held in at least the past 2.5 years, and potentially none has ever been held since the Association's formation. The failure to hold meetings required by statute has necessarily resulted in the failure to provide meeting notices to Members as required by Bylaws § 6.02 and T.C.A. § 48-57-105, the absence of any opportunity for Members to participate in governance, and the absence of any forum in which budgets, assessments, fees, or collection policies could be presented, questioned, or challenged.

44A. On July 29, 2025, Plaintiff sent a formal written demand to the Board of Directors of Prairie Pass Homeowner's Association, posted publicly in the community Facebook group, demanding information about a secret meeting held by the developer/builder (D.R. Horton) with hand-selected resident "representatives." The demand requested: (1) the selection criteria for the representatives; (2) why all homeowners were excluded; and (3) when meeting notes would be provided. No response was ever received. This July 2025 demand — which preceded the billing dispute by approximately five months — establishes that the pattern of ignoring member demands, operating in secrecy, and refusing transparency long predates the events giving rise to the FDCPA claims in this action. It further establishes that Plaintiff's communications with the Association have

been consistently professional and substantive, directly contradicting Selby-Webb's March 2026 characterization of Plaintiff's conduct as "volatile."

45. Bylaws § 5.16 requires the Board (or Developer acting as Board under § 5.12) to furnish to Owners: (1) a budget for the coming fiscal year itemizing estimated Common Expenses with estimated allocation to each Owner; and (2) a statement of Common Expenses itemizing receipts and disbursements for the previous year. While the Bylaws specify delivery "within ten (10) days after the annual meeting," the obligation to prepare budgets and provide financial transparency to Members exists independently under T.C.A. § 48-66-201, which requires all Tennessee nonprofit corporations to furnish annual financial statements including a balance sheet — a statutory obligation with no meeting-trigger prerequisite. The Developer's fiduciary duties (T.C.A. §§ 48-58-301, 601) further require financial transparency to the Members whose assessments fund the Association. Plaintiff has never received a budget, financial statement, or fiscal report of any kind from the Association, the Developer, or Selby-Webb.

46. T.C.A. § 48-66-101 requires the Association to keep permanent records including: minutes of all meetings, accounting records, a member list with addresses and voting rights, board resolutions relating to member rights, written communications to members for the past three years, current director and officer names and addresses, and the most recent annual report to the Secretary of State. Upon information and belief, many of these records do not exist because no meetings have been held and no Board has been constituted.

47. Bylaws § 5.16 further requires that copies of all Rules and Regulations be furnished to each Owner prior to the time they become effective. Plaintiff has never received any

20

Rules and Regulations from the Association, the Developer, or Selby-Webb. To the extent that any collection policies, fee schedules, lien procedures, or other Rules and Regulations have been adopted during the period of Developer control, they were adopted without notice to Members and without compliance with the Bylaws' requirement that copies be furnished prior to effectiveness.

48. Declaration § 5.03 provides that the annual assessment amount "shall be set by the Board of Directors" unless 75% of Members vote to change it. Under Bylaws § 5.12, the Developer exercises this authority prior to governance transfer. However, the current semi-annual assessment of $350.00 appears nowhere in the Declaration or any of its three amendments. No Board resolution or Developer determination setting this amount has ever been produced or disclosed to Members. No written notice to homeowners announcing the assessment amount or explaining its basis has been identified. No budget showing how the $350.00 figure was calculated or what expenses it covers has ever been prepared or furnished. The assessment amount may have changed over time — the initial prorated amount on Plaintiff's account statement was $85.34, suggesting a different rate at inception — and any changes were never communicated or explained. While the Developer may have authority to set assessment amounts, the authority to set assessments does not include the authority to set them in secret. The Developer's exercise of assessment-setting power without any communication, documentation, or financial transparency to the Members who must pay those assessments constitutes a breach of the Developer's fiduciary duties under T.C.A. §§ 48-58-301 and 48-58-601, and a violation of the statutory obligation to furnish financial statements under T.C.A. § 48-66-201.

Case 1:26-cv-00084-CLC-MJD    Document 1    Filed 03/26/26    Page 21 of 36    PageID #: 21

### I. Obstruction of Statutory Inspection Rights

49.  On March 24, 2026, Plaintiff sent a formal written demand for inspection of Association records pursuant to T.C.A. § 48-66-102(a) and Bylaws § 8.08. The statute requires the Association to make records available within five (5) business days of written demand, and T.C.A. § 48-66-102(d) provides that this right "may not be abolished or limited by a corporation's charter or bylaws."

50.  In response, Selby-Webb's Marlene Webb stated that "our books are always open for any owner" but offered inspection dates of April 6, 13, and 20, 2026 — all outside the five-business-day statutory window. When Plaintiff objected, Webb stated that "security" arrangements were needed "due to your previous volatile behavior." This characterization is false and defamatory. Plaintiff's communications with Selby-Webb have been exclusively by email and are uniformly professional, as the complete written record demonstrates.

51.  The imposition of pretextual conditions on the exercise of a statutory inspection right, combined with the offering of dates outside the mandatory statutory period, constitutes a constructive refusal triggering mandatory attorney's fees under T.C.A. § 48-66-104 if the court finds the Association did not act in good faith.

### J. Selby-Webb's Pattern of Obstruction, Stalling, and Bad-Faith Dispute Handling

52A.  Beginning with Plaintiff's earliest communications regarding the disputed charges, Selby-Webb's Marlene Webb engaged in a pattern of obstruction, stalling, and willful refusal to honor Plaintiff's statutory dispute rights. This pattern demonstrates that

Selby-Webb was not merely negligent — it was deliberately designed to run out the clock and pressure Plaintiff into paying disputed, unauthorized charges.

52B. When Plaintiff first disputed the charges directly with Marlene Webb, Webb's responses were dismissive and evasive. Rather than acknowledging the dispute, ceasing collection activity, or providing any form of documentation or validation, Webb ignored the substance of the dispute entirely and deferred with responses to the effect of "I can speak to the attorney when they forward the issue" — effectively treating a formal dispute as an inconvenience to be passed along rather than an obligation to be honored. This conduct constitutes a willful refusal to honor a consumer's dispute rights.

52C. When Plaintiff demanded inspection of Association records pursuant to T.C.A. § 48-66-102(a), Webb initially responded that "our books are always open for any owner" — appearing to agree to the demand. However, the dates offered (April 6, 13, and 20, 2026) were all outside the statutory five-business-day window, effectively converting an apparent agreement into a delay tactic. When Plaintiff objected to the non-compliant dates and demanded access within the statutory period (by March 31, 2026), Webb imposed new, pretextual conditions, claiming "security" arrangements were needed "due to your previous volatile behavior." This characterization is false and defamatory. All of Plaintiff's communications with Selby-Webb have been by email and are uniformly professional, as the complete written record demonstrates.

52D. On March 25, 2026, after Plaintiff's formal demand letter reasserted the March 31 records inspection deadline and the outstanding FDCPA violations, Webb responded with a one-line message stating: "Given your reference to 'pending and anticipated legal action' in your previous message, all communication going forward will need to be

through our attorney, Philip Meyer." This response — sent on the same date Plaintiff reiterated the statutory records deadline — constitutes a further attempt to obstruct Plaintiff's statutory rights and delay compliance by interposing attorney involvement that had already been present throughout the dispute. Mr. Meyer and/or his office had been copied on every communication to date.

52E. The pattern is unmistakable: (1) First, Selby-Webb ignored the initial dispute entirely; (2) then, Selby-Webb appeared to agree to the records demand but offered dates outside the statutory window; (3) then, Selby-Webb imposed pretextual "security" conditions when called on the non-compliance; (4) then, Selby-Webb refused to communicate further, directing Plaintiff to an attorney who had already been copied on everything and had himself failed to respond to the records demand or validate the disputed debt. Each step in this pattern was designed to delay, obstruct, and ultimately deny Plaintiff's exercise of rights guaranteed by federal and Tennessee law.

52F. With respect to Selby-Webb's role in the FDCPA violations: Selby-Webb, through Marlene Webb, was the initial party to engage in collection activity against Plaintiff on behalf of Prairie Pass HOA. Webb's January 13, 2026 email expressly stated: "I have been instructed to proceed with collection on the outstanding balance associated with your account." This is a written admission of debt collection activity on behalf of a third party. When Plaintiff disputed the charges in response, Webb did not cease collection activity as required by 15 U.S.C. § 1692g(b). Instead, Webb dismissed the dispute, refused to provide validation, and ultimately escalated to Meyer & Burnett for further collection — all without ever acknowledging or honoring the dispute.

## FDCPA COMMON ALLEGATIONS

### (Applicable to Counts I, II, and III)

52. Plaintiff incorporates all prior paragraphs.

53. At all relevant times, Defendants Meyer & Burnett and Philip Meyer II were "debt collectors" within the meaning of 15 U.S.C. § 1692a(6), as they regularly collect or attempt to collect debts owed to others. Their own March 17, 2026 letter includes the § 1692g(a) mini-Miranda disclosure, constituting a functional admission of debt-collector status.

53A. Prairie Pass HOA is liable for the FDCPA violations of Meyer & Burnett and Selby-Webb under principles of agency law. Meyer & Burnett and Selby-Webb acted as agents of Prairie Pass in collecting the debts at issue. A principal is liable for the statutory violations of its agent acting within the scope of the agency. See Clark v. Capital Credit & Collection Servs., Inc., 460 F.3d 1162, 1173 (9th Cir. 2006); Pollard v. Law Office of Mandy L. Spaulding, 766 F.3d 98, 103 (1st Cir. 2014).

54. The HOA assessments and charges at issue are "debts" under 15 U.S.C. § 1692a(5). See Ladick v. Van Gemert, 146 F.3d 1205 (10th Cir. 1998); Newman v. Boehm, Pearlstein & Bright, Ltd., 119 F.3d 477 (7th Cir. 1997).

55. Plaintiff is a "consumer" under 15 U.S.C. § 1692a(3).

56. Plaintiff suffered concrete injuries from each independent violation set forth in Counts I through III, including: monetary harm of no less than $400.00 in unauthorized fees (the full extent of which remains unknown due to Defendants' refusal to provide a complete accounting); property harm from the threatened recording of a lien against Plaintiff's real

property; informational injury analogous to common-law fraud and misrepresentation; and diversion of resources. See TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2204 (2021).

57. With respect to statutory damages, Plaintiff acknowledges that 15 U.S.C. § 1692k(a)(2)(A) limits statutory damages to $1,000.00 per action. Plaintiff seeks $1,000.00 in statutory damages for the collective violations set forth in Counts I through III. However, actual damages under § 1692k(a)(1) are separately recoverable for each independent violation without any statutory cap, and each Count below identifies the specific actual damages proximately caused by that violation.

## COUNT I: FDCPA — OVERSHADOWING OF 30-DAY DISPUTE RIGHTS
### 15 U.S.C. § 1692g(a) — First Violation
### (Against Meyer & Burnett, PLLC and Philip Meyer II)

58. Plaintiff incorporates all prior paragraphs, including the FDCPA Common Allegations.

59. On March 17, 2026, Defendants sent Plaintiff a collection letter that demanded payment "on or before March 21, 2026" — four (4) calendar days (96 hours) from the date of the letter — while simultaneously disclosing Plaintiff's 30-day right to dispute the debt under § 1692g(a). The March 21 demand was accompanied by the threat that Defendants would "take further legal action, including filing a notice of lien against your property" if payment was not received by that date.

60. Under the "least sophisticated debtor" standard applied in the Sixth Circuit, see Harvey v. Great Seneca Fin. Corp., 453 F.3d 324, 329 (6th Cir. 2006), a debtor receiving a demand for payment within four days under an explicit threat of lien would reasonably forego her

30-day dispute rights. The payment demand overshadows and is inconsistent with the disclosure of dispute rights, in violation of § 1692g(a). See also Mashiri v. Epsten Grinnell & Howell, 845 F.3d 984, 991 (9th Cir. 2017) (holding virtually identical HOA pre-lien letter violated the FDCPA); Gionis v. Javitch, Block & Rathbone, 238 F. App'x 24 (6th Cir. 2007) (applying least-sophisticated-consumer standard to overshadowing claim). No federal circuit has rejected Mashiri's reasoning. The demand for payment within 96 hours, coupled with the threat of immediate property encumbrance, would lead the least sophisticated consumer to believe that the 30-day validation period is a mere formality and that their property is in imminent danger unless the validation right is waived.

61. Actual damages from this violation include: Plaintiff's reasonable belief, upon receipt of the letter, that the lien threat was unconditional and that his dispute rights were illusory; the time and cost expended in researching and drafting a formal dispute letter within the artificially compressed timeframe; and the emotional distress and anxiety caused by the threat to encumber Plaintiff's real property.

## COUNT II: FDCPA — UNQUALIFIED LIEN THREAT OVERSHADOWING DISPUTE RIGHTS

### 15 U.S.C. § 1692g(a) — Second Violation

### (Against Meyer & Burnett, PLLC and Philip Meyer II)

62. Plaintiff incorporates all prior paragraphs, including the FDCPA Common Allegations.

63. The same March 17, 2026 letter threatened that Defendants would "take further legal action, including filing a notice of lien against your property" if payment was not made

by March 21, 2026. This lien threat was stated without any qualification that such collection activity must cease if Plaintiff disputes the debt in writing within the 30-day period.

64. Under the FDCPA, a debt collector must cease all collection activity upon written dispute until verification is provided and mailed. 15 U.S.C. § 1692g(b). By threatening lien recording without disclosing that the threat is conditional on Plaintiff's exercise of dispute rights, the letter "effectively overshadows the disclosed right to dispute by conveying an inaccurate message that exercise of the right does not have an effect that the statute itself says it has." Mashiri, 845 F.3d at 992 (quoting Pollard v. Law Office of Mandy L. Spaulding, 766 F.3d 98, 104 (1st Cir. 2014)). This is an independent violation of § 1692g(a), separate from the overshadowing in Count I.

65. Actual damages from this violation include: Plaintiff's reasonable belief that a lien would be recorded against his property regardless of whether he disputed the debt, thereby chilling the exercise of his federally protected dispute rights; the property harm created by the unconditional lien threat constituting a cloud on title; and the time and resources diverted to address the threatened encumbrance on Plaintiff's real property.

## COUNT III: FDCPA — CONTINUED COLLECTION AFTER WRITTEN DISPUTE WITHOUT VERIFICATION

### 15 U.S.C. §§ 1692g(b), 1692e, and 1692f(1) — Third Violation

### (Against Meyer & Burnett, PLLC and Philip Meyer II)

66. Plaintiff incorporates all prior paragraphs, including the FDCPA Common Allegations.

67. On March 17, 2026, Plaintiff sent Defendants a formal written dispute pursuant to § 1692g(b), disputing the validity of the entire amount claimed and specifically disputing all charges in excess of $750.00 in base assessments.

68. On March 23, 2026, Defendants responded with a letter that: (a) failed to provide verification of the debt as required by § 1692g(b); (b) demanded that Plaintiff "tender the amount owed"; (c) stated that "additional charges related to your delinquent payment will not be waived or removed from your account"; and (d) refused Plaintiff's documentation requests by claiming "privilege" and characterizing them as "excessive."

69. Under § 1692g(b), upon receipt of a written dispute, a debt collector "shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt... and a copy of such verification... is mailed to the consumer." The March 23 letter's demand for payment and refusal to waive charges constitutes continued collection activity in direct violation of this provision. See Jang v. A.M. Miller & Assocs., 122 F.3d 480, 483 (7th Cir. 1997) (any collection activity after written dispute without verification violates § 1692g(b)); Clark v. Capital Credit & Collection Servs., Inc., 460 F.3d 1162, 1174 (9th Cir. 2006) (same).

70. Defendants further violated § 1692e by making false and misleading representations regarding the character, amount, and legal status of the debt in the March 23 letter, including misrepresenting that Plaintiff had been "presented with the documentation required by law" when no verification had been provided.

71. Defendants further violated § 1692f(1) by attempting to collect no less than $400.00 in unauthorized "Intent to Lien / Legal Charge" fees — and potentially additional undisclosed charges — not expressly authorized by the Declaration or permitted by law.

72. Actual damages from this violation include: the $400.00 (or more) in unauthorized fees that Defendants continued to demand after receiving Plaintiff's written dispute; the costs and time expended in researching and preparing a second formal response to the March 23 letter; and the ongoing cloud on title and threat to Plaintiff's property interest created by Defendants' continued collection activity in defiance of the FDCPA's verification requirements.

## COUNT IV: TENNESSEE CONSUMER PROTECTION ACT

### T.C.A. §§ 47-18-104(b)(5), (b)(7), (b)(12), and 47-18-109

### (Against All Defendants)

73. Plaintiff incorporates all prior paragraphs.

74. Defendants violated T.C.A. § 47-18-104(b)(5) by representing that their services (account management, billing, collection) had characteristics they did not have, including accurate billing and proper account maintenance, when in fact they maintained incorrect contact information for over twelve months and called wrong phone numbers belonging to strangers in Florida.

75. Defendants violated T.C.A. § 47-18-104(b)(7) by representing through account statements that charges were of a particular standard and legitimacy when they were not — the $175.00 and $225.00 charges are represented as lawful obligations but are not authorized by the Declaration, and even the property manager admitted she could not explain the $175.00 charge.

76. Defendants violated T.C.A. § 47-18-104(b)(12) by misrepresenting the terms of the transaction, including inflating the amount owed by no less than $400.00 in unauthorized

charges, and by continuing to assess additional fees and costs without authorization or proper disclosure.

77.     Selby-Webb's willful refusal to provide documentation about the disputed charges is further evidence of deceptive conduct. On January 16, 2026, when Plaintiff requested documentation and asked to speak with the attorney, Selby-Webb's Marlene Webb stated: "You can speak to him once we turn you over." This statement conditioned Plaintiff's access to information about charges on his own account on the escalation of collection proceedings against him — the very definition of an unfair act or practice designed to coerce payment of disputed amounts.

78.     These violations were willful and knowing. Meyer & Burnett is a law firm holding itself out as knowledgeable in HOA matters. Selby-Webb rejected Plaintiff's good-faith offer to pay $100/month while the dispute was resolved, ignored four consecutive contact attempts in three days, refused to produce documentation about the charges, and then escalated to attorney collection. T.C.A. § 47-18-109(a)(3) authorizes treble (3x) damages for willful or knowing violations.

79.     Plaintiff has suffered ascertainable losses of no less than $400.00 in unauthorized fees — an amount that may increase as a full accounting is obtained — plus costs of responding to unlawful collection. Plaintiff is entitled to actual damages and treble damages.

## COUNT V: BREACH OF DECLARATION

### (Against Prairie Pass and Selby-Webb)

80.     Plaintiff incorporates all prior paragraphs.

81. The Declaration is a binding contract. The Association breached it by: (a) failing to maintain correct contact information and failing to send notices to Plaintiff's last known address or property address (§§ 9.04, Bylaws 8.03); (b) assessing the $175.00 and $225.00 "Intent to Lien / Legal Charge" fees, and any other fees, costs, or charges in excess of the base assessments, without authorization in the Declaration, Bylaws, or any duly adopted Board resolution; (c) refusing access to Association records (Bylaws § 8.08); (d) failing to furnish budget/financial statements (Bylaws § 5.16).

82. Selby-Webb, as agent of the Association, is jointly liable.

83. Plaintiff has been damaged in an amount to be proven at trial.

## COUNT VI: DECLARATORY AND INJUNCTIVE RELIEF

### (Against All Defendants)

84. Plaintiff incorporates all prior paragraphs.

85. Plaintiff seeks a declaratory judgment under 28 U.S.C. §§ 2201–2202 declaring: (a) the $175.00 and $225.00 "Intent to Lien / Legal Charge" fees, and any and all other fees, penalties, interest, attorney's fees, collection costs, or other charges assessed against Plaintiff's account in excess of the base semi-annual assessments authorized by Article V of the Declaration, are void and unenforceable; (b) Plaintiff's total lawful obligation is $750.00 in base assessments; (c) Defendants are permanently enjoined from recording any lien for the disputed charges.

86. Plaintiff further seeks an order directing the Association to: (a) remove from Plaintiff's account all charges in excess of the base assessments, including but not limited to the $175.00 and $225.00 "Intent to Lien / Legal Charge" fees and any additional fees, costs,

interest, penalties, or attorney's fees that have been or may hereafter be assessed; (b) accept $750.00 in full satisfaction of Plaintiff's account; and (c) cease all collection activity on the disputed charges.

## COUNT VII: UNJUST ENRICHMENT

### (Against Prairie Pass and Selby-Webb)

87. Plaintiff incorporates all prior paragraphs.

88. Defendants Prairie Pass and Selby-Webb have been conferred a benefit in the form of no less than $400.00 in unauthorized "Intent to Lien / Legal Charge" fees, and any additional unauthorized fees, costs, interest, or charges assessed to Plaintiff's account in excess of base assessments.

89. Defendants appreciated and accepted this benefit by maintaining the charges on Plaintiff's account ledger, using them as the basis to retain collection counsel, and demanding payment of the inflated total from Plaintiff.

90. Under the circumstances — including the Association's own 12-month failure to bill Plaintiff, its maintenance of incorrect contact information, its failure to process a $750.00 payment, its refusal to provide documentation supporting the charges, and the assessment of fees without authorization in the Declaration or any board resolution — it is inequitable for Defendants to retain the benefit of these unauthorized charges.

91. Plaintiff is entitled to restitution of all unauthorized amounts assessed and to disgorgement of any unjust enrichment derived therefrom.

## COUNT VIII: BREACH OF FIDUCIARY DUTY

92. Plaintiff incorporates all prior paragraphs.

93. As a Tennessee nonprofit corporation organized to administer a homeowners association, Prairie Pass and those exercising Board functions on its behalf owe fiduciary duties to all Members, including Plaintiff. Under Bylaws § 5.12, the Developer has exercised "all the powers and privileges and performing all the duties and obligations" of the Board for over fourteen years. By assuming the Board's powers, the Developer assumed the Board's fiduciary duties — including the duty of care, the duty of loyalty, the duty of good faith, and the duty of full disclosure. See T.C.A. §§ 48-58-301, 48-58-601 (Tennessee Nonprofit Corporation Act); In re Estate of Potter, No. W2016-01809-COA-R3-CV (Tenn. Ct. App. 2017). A fiduciary cannot exercise power without accountability, and the authority to act on behalf of Members does not include the authority to act in secret.

94. Prairie Pass and the Developer breached their fiduciary duties by: (a) failing to maintain correct contact information and billing records for Plaintiff; (b) assessing the $175.00 and $225.00 "Intent to Lien / Legal Charge" fees without authorization in the Declaration, Bylaws, or any duly adopted resolution — fees that are void under every possible characterization as set forth herein; (c) setting assessment amounts without any written notice, resolution, budget, or financial disclosure to Members; (d) refusing Plaintiff's requests for records and documentation as required by Bylaws § 8.08 and T.C.A. § 48-66-102; (e) failing to furnish annual budgets and financial statements as required by Bylaws § 5.16 and T.C.A. § 48-66-201; (f) retaining collection counsel to pursue inflated

and unauthorized amounts without first making any good-faith effort to resolve Plaintiff's dispute; (g) through its agent Selby-Webb, conditioning Plaintiff's access to information about his own account on the escalation of collection proceedings; (h) allowing Developer rights to change hands multiple times without ever notifying Members of the identity of the entity or individuals exercising Board authority over them; and (i) exercising all powers of the Board for fourteen years while providing no transparency, no financial reporting, and no mechanism for Member participation or oversight.

95. With respect to the statute of limitations, T.C.A. § 48-58-601 provides a one-year limitations period for breach of fiduciary duty, but also provides that where the breach "is not discovered nor reasonably should have been discovered within the one-year period, the period of limitation shall be one (1) year from the date such was discovered or reasonably should have been discovered." The statute further provides that where "there is fraudulent concealment on the part of the defendant," the three-year outer limit is also tolled. Here, the Developer's complete failure to identify itself, hold meetings, provide financial statements, or disclose any information about HOA governance constitutes fraudulent concealment. Plaintiff could not have discovered the breaches alleged herein until the 2025-2026 billing dispute forced him to investigate the Association's governance. The statute of limitations has not run on any claim alleged herein.

95. As a direct and proximate result of these breaches, Plaintiff has suffered damages including but not limited to the unauthorized fees assessed, costs of responding to unlawful collection efforts, and the threatened cloud on title to his property.

## COUNT IX: NEGLIGENCE

**(Against Selby-Webb Property Management, Inc.)**

96. Plaintiff incorporates all prior paragraphs.

97. Selby-Webb, as the professional property management company retained by Prairie Pass to manage the day-to-day affairs of the Association, owed a duty of reasonable care to Plaintiff in maintaining Plaintiff's account, processing payments, maintaining accurate contact information, sending invoices and billing correspondence, and communicating with Plaintiff regarding the status of his account.

98. Selby-Webb breached its duty of care by: (a) maintaining incorrect phone numbers on file for Plaintiff (407-695-8623 and 321-231-0511 — both Florida area codes belonging to strangers) despite Plaintiff's correct contact information being available in the closing documents; (b) failing to send any billing correspondence to Plaintiff for approximately twelve (12) months; (c) failing to process or deposit Plaintiff's $750.00 check; (d) failing to respond to four (4) consecutive contact attempts by Plaintiff between January 13 and January 16, 2026; and (e) failing to investigate and resolve the payment discrepancy before escalating the matter to collection.

99. The economic loss doctrine does not bar this claim. Selby-Webb owed an independent duty of care to Plaintiff arising from its professional relationship as property manager, separate from any contractual duties under the Declaration. See Milan Supply Chain Solutions v. Navistar, 627 S.W.3d 125 (Tenn. 2021) (economic loss doctrine does not apply where independent duty exists). Moreover, Selby-Webb's negligence caused property harm (cloud on title) in addition to purely economic losses.